88 F.3d 831
 152 L.R.R.M. (BNA) 2754, 132 Lab.Cas. P 11,625
 William E. FRY, Richard B. Gifford, Thomas C. Gipson, Edwin
C. Hart, Jr., Jeffrey J. Hill, William H. Palmer, Pierre W.
Pippert, David C. Halverson, Leah Fry, Nancy Galios, Ginger
Gipson, Birgitta Hill, Sharon Palmer, Kay Halverson, Stephen
E. Galios, Plaintiffs-Appellants/Cross-Appellees,
v.
AIRLINE PILOTS ASSOCIATION, INTERNATIONAL, a labor
organization; Airline Pilots Association, Master
Executive Counsel For United Airlines,
Defendants-Appellees/Cross-Appellants
and
United Airlines, Inc., Defendant-Appellee.
 Nos. 94-1509, 94-1523.
 United States Court of Appeals,
Tenth Circuit.
 June 28, 1996.
Rehearing Denied Aug. 22, 1996.
 
 Gregory D. Barton (Murray Ogborn with him on the briefs), Harding & Ogborn, Lincoln, Nebraska, for Plaintiffs-Appellants/Cross-Appellees.
 Stephen P. Berzon of Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California (Gary Green and Jonathan A. Cohen, Air Line Pilots Association, Legal Department, Washington, D.C.; Andrew W. Loewi and Robert Troyer of Brownstein, Hyatt, Farber & Strickland, Denver, Colorado; and Jeffrey B. Demain of Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California, with him on the briefs), for Defendants-Appellees/Cross-Appellants.
 Robert A. Siegel (Victoria D. Stratman and Michael G. McGuinness with him on the brief), of O'Melveny & Myers, Los Angeles, California, for Defendant-Appellee, United Airlines, Inc.
 Before ANDERSON, and McWILLIAMS, Circuit Judges, and HOLMES,* District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 INTRODUCTION
 
 1
 Plaintiffs/appellants, nine nonstriking pilots for United Airlines and six of their wives, brought suit against United and the Airline Pilots Association ("ALPA")[1] based on post-strike harassment of the nonstriking pilots. The district court granted United's summary judgment motion on all claims because the claims were either preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-163, 181-188, or barred by the exclusive remedy provision of the Colorado Worker's Compensation Act, Colo.Rev.Stat. §§ 8-40-101 to 8-47-209. The court also granted ALPA's motion for summary judgment on all but three claims--the plaintiffs' claim for intentional infliction of emotional distress and the derivative claims for loss of consortium and punitive damages ("emotional distress claims")--on RLA preemption grounds and denied ALPA's motion as to the emotional distress claims.
 
 
 2
 The plaintiffs appeal the grant of summary judgment on all of their claims against United and the grant of summary judgment on all but the emotional distress claims against ALPA. We affirm. ALPA cross-appeals, pursuant to 28 U.S.C. § 1292(b), the district court's denial of its summary judgment motion on the emotional distress claims. ALPA argues, among other things, that the district court analyzed the plaintiffs' evidence using improper legal assumptions, and, when viewed properly, the plaintiffs have not presented sufficient evidence to survive summary judgment. We agree, and accordingly vacate and remand this case to the district court with instructions to grant ALPA's summary judgment motion on the remaining claims.
 
 BACKGROUND
 
 3
 On May 17, 1985, ALPA declared a strike against United that lasted twenty-nine days. The strike began to appear imminent months before, so in an effort to mitigate the disruption of a strike, United began to seek replacement pilots who had been trained on equipment flown by United. United also actively recruited union pilots to cross the picket line and promised to protect and "never forsake" these "working" pilots. At the end of the strike, United and ALPA negotiated and signed a Back-to-Work Agreement ("BWA") which prohibited either side from engaging in any reprisals or recriminations. United Suppl. App. Vol. VI at 1618; see, e.g., Appellants' App. Vol. VII at 1990-91. Nevertheless, the plaintiffs and their families were subjected to continuous harassment and intimidation by ALPA members. United initially attempted to protect the working pilots through various protective measures and strong statements against those perpetrating the "campaign of violence." See, e.g., Appellants' App. Vol. VI at 1801-03; United Suppl. App. Vol. III at 705-07, 779-81; id. Vol. IV at 1187-90; id. Vol. V at 1296-97, 1467-68, 1473-76; id. Vol. XI at 3074-76. The plaintiffs contend, however, that within two years of the strike, roughly coinciding with Richard Ferris' resignation as United's CEO, United began acquiescing in ALPA's alleged persecutions in order to appease the pilot union.[2]
 
 
 4
 On February 2, 1992, nine current and former United working pilots and six of their wives filed their third amended complaint alleging eleven claims for relief based on the post-strike harassment.[3] United and ALPA filed separate answers and subsequently filed separate motions for summary judgment.
 
 
 5
 On June 14, 1994, Magistrate Judge Bruce D. Pringle filed his recommendation in favor of granting summary judgment for United on all claims and for ALPA on all claims, based on RLA preemption, except the plaintiffs' emotional distress claims. On June 27, 1994, the plaintiffs objected to the recommendation, partly based on a Supreme Court decision, Hawaiian Airlines, Inc. v. Norris, --- U.S. ----, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), decided on June 20, 1994, subsequent to the issuance of the magistrate judge's recommendation. They contended that Norris narrowed the scope of RLA preemption and thus supported their position that their claims were not preempted. The district court sent the case back to the magistrate judge for reconsideration in light of Norris. The magistrate judge affirmed his prior recommendation noting that he relied on the standard in Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), as the rule for preemption under the RLA, which was the standard expressly adopted in Norris. He also reiterated that the claims required interpretation of several collective bargaining agreements ("CBAs"). The district court adopted the magistrate judge's recommendation in an order dated September 16, 1994. We review the district court's granting of summary judgment and the district court's RLA preemption determination de novo. TPLC, Inc. v. United Nat'l Ins. Co., 44 F.3d 1484, 1489 (10th Cir.1995); see Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 214, 216, 105 S.Ct. 1904, 1912-13, 1913-14, 85 L.Ed.2d 206 (1985); Albertson's, Inc. v. Carrigan, 982 F.2d 1478, 1481-82 (10th Cir.1993).
 
 DISCUSSION
 
 6
 I. The Railway Labor Act.
 
 
 7
 Congress enacted the RLA in 1926 to prevent strikes in vital transportation industries by providing a comprehensive framework for resolving labor disputes. The RLA establishes an arbitral remedy for the resolution of "disputes between an employee ... and a carrier ... growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. §§ 153 First (i) & 184. The Supreme Court has determined that the National Railroad Adjustment Board has exclusive jurisdiction over "minor" disputes. Union Pacific R.R. v. Sheehan, 439 U.S. 89, 94, 99 S.Ct. 399, 402-03, 58 L.Ed.2d 354 (1978); Andrews v. Louisville & Nashville R.R., 406 U.S. 320, 321-22, 92 S.Ct. 1562, 1563-64, 32 L.Ed.2d 95 (1972).[4] Norris further defines minor disputes as disputes arising over duties "rooted firmly in the collective-bargaining agreement" so that " 'any attempt to assess liability here inevitably will involve [labor] contract interpretation,' " Norris, --- U.S. at ---- - ----, 114 S.Ct. at 2247-48 (quoting Allis-Chalmers, 471 U.S. at 218, 105 S.Ct. at 1914-15), or as disputes that are dependent on the interpretation of CBAs. Id. at ----, 114 S.Ct. at 2249 (citing Lingle ).
 
 
 8
 The Court's ruling in Norris did not change the fundamental fact that employment related "minor disputes" will continue to be subject to the exclusive and mandatory jurisdiction of system boards of adjustment. Nor did Norris necessarily narrow the scope of federal preemption under the RLA as the plaintiffs contend.[5] Norris expressly adopted the Lingle standard (used for determining § 301 of the Labor Management Relations Act (" § 301") preemption claims) for resolving claims of RLA preemption. As indicated above, that standard requires preemption whenever a claim's resolution calls for interpretation of a CBA. This court had already applied the Lingle standard to RLA cases in Davies v. American Airlines, Inc., 971 F.2d 463, 466-67 (10th Cir.1992), cert. denied, 508 U.S. 950, 113 S.Ct. 2439, 124 L.Ed.2d 657 (1993), and the magistrate and district court judges properly employed that standard in the instant case.[6]
 
 
 9
 Under both Norris and Lingle, the threshold question remains whether resolution of the federal and state law claims of the plaintiffs requires interpretation or application of the CBAs. Norris, --- U.S. at ----, 114 S.Ct. at 2247; Lingle, 486 U.S. at 405-06, 108 S.Ct. at 1881-82. Norris also confirmed labor law's longstanding recognition that a CBA is more than the sum of its parts. It comprises express provisions, industry standards, and "norm[s] that the parties have created but have omitted from the collective bargaining agreement's explicit language." Norris, --- U.S. at ----, 114 S.Ct. at 2250; see also Allis-Chalmers, 471 U.S. at 215-16, 105 S.Ct. at 1913-14 (CBAs may contain implied as well as express terms); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578-79, 80 S.Ct. 1347, 1350-51, 4 L.Ed.2d 1409 (1960) (CBAs are intended to cover the entire employment relationship). Thus, plaintiffs' claims are minor disputes if they depend not only on a right found in the CBAs, but also if they implicate practices, procedures, implied authority, or codes of conduct that are part of the working relationship.
 
 
 10
 Preemption of minor disputes under the RLA or § 301 extends to any suit that "is inextricably intertwined with consideration of the terms of the labor contract." Allis-Chalmers, 471 U.S. at 213, 105 S.Ct. at 1912. We have previously noted:
 
 
 11
 "[p]laintiffs ... often [attempt] to avoid federal jurisdiction under § 301 by framing their complaints in terms of such diverse state law theories as wrongful discharge, intentional infliction of emotional distress, conspiracy, and misrepresentation." United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Indus. v. Bechtel Power Corp., 834 F.2d 884, 887-88 (10th Cir.1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988). We rejected that practice, stating that "federal courts look beyond the allegations of the complaint ... to determine whether the wrong complained of actually arises in some manner from a breach of the defendants' obligations under a collective bargaining agreement." Id. at 888.
 
 
 12
 Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 530 (10th Cir.1992); cf. Allis-Chalmers, 471 U.S. at 219-20, 105 S.Ct. at 1915-16 (because labor arbitration needs to be protected and encouraged, courts should be wary of allowing employees to try to bypass arbitration by recasting disputes with employers as state law claims). After careful review of the record, we conclude that the district court properly determined that plaintiffs' state law claims, based on the theory that United reneged on its responsibility to protect the plaintiffs, cannot be understood without reference to the various CBAs.
 
 
 13
 Plaintiffs rely on cases such as Hirras v. National R.R. Passenger Corp., 44 F.3d 278 (5th Cir.1995), to explain why preemption of their emotional distress claims is inappropriate. In Hirras, the court held it was not necessary to consult the CBA to resolve whether the handling of sexual harassment was outrageous because outrageous conduct could be determined under the applicable state law standard. Hirras, 44 F.3d at 282-83. Hirras is easily distinguished because regardless of what was agreed upon in the CBA, the employer had state law obligations " 'wholly apart from any provision of the CBA.' " Id. at 282 (quoting Norris, --- U.S. at ----, 114 S.Ct. at 2247). In this case, however, the alleged outrageous conduct is inextricably bound up with agreements and promises made to protect, and then actions allegedly forsaking, the plaintiffs. As the magistrate judge succinctly stated: "Only by comparing the protective system promised by United with the system put into place by the various labor agreements between United and the ALPA can the fact finder determine whether United breached its contract with the plaintiffs, whether United's representations were false, and whether United's conduct was outrageous." Appellants' App. Vol. VII at 2190; see also Johnson v. Beatrice Foods Co., 921 F.2d 1015, 1020 (10th Cir.1990) (claims such as intentional infliction of emotional distress cannot be detached from the milieu in which they took place); Fisher v. Hertrich, 680 F.Supp. 1250, 1253 (N.D.Ill.1988) (ruling United's actions leading to an emotional distress claim of a striking pilot may have "resulted from residual frustration over the pilots' strike," and that "[l]abor relations ... permeate this lawsuit," mandating preemption).
 
 
 14
 The RICO, COCCA, and conspiracy claims are similarly based on the agreements between United and ALPA concerning rules, employee relations, and conditions of work. The plaintiffs argued United actively attempted to protect the working pilots for two years, but then deserted them once the decision was made to "appease the Union and make peace at any cost." Appellants' App. Vol. III at 913. As proof of United's "specific intent to facilitate ongoing acts of harassment against the working pilots to drive them from United's employment," the plaintiffs allege United, among other things, removed the protective measures, initiated no further protective measures, dismissed all strike related disciplinary actions, revoked its Code of Conduct, reinstated striking pilots who had previously been discharged, and reconfigured the Flight Training Center to eliminate most working pilots. Id. at 913-14.
 
 
 15
 The plaintiffs argue we can make the requisite determinations under RICO/COCCA without reference to CBAs because we need only look at United's motives for entering into such agreements. This argument ignores the fact that the duties and alleged violations arose out of agreements such as the BWA, the Unimatic Letter of Agreement (restoring ALPA's access to pilot schedules), the Professional Standards Letter of Agreement (providing for the utilization of peer committees to resolve disputes between former strikers and nonstrikers), replacement of the TCA letter (regarding staffing issues at the Denver Training Center), and provisions of the basic CBA (governing such aspects as training and discipline).[7] Thus, while the plaintiffs argue these arrangements demonstrate United's abandonment of its promise to protect and never forsake them, see, e.g., Appellants' Br. at 17-20, the defendants argue these same arrangements were implemented to ease labor tension and thereby reduce harassment of working pilots. See, e.g., United's Br. at 7-9; ALPA's Br. at 3-4. Both contentions conclusively establish, if nothing else, that the plaintiffs' conspiracy claims against both United and ALPA can only be resolved through interpretation and application of the CBAs which provided for such actions and agreements. Cf. Underwood v. Venango River Corp., 995 F.2d 677, 685-86 (7th Cir.1993) (although incorrectly finding that RLA preemption is broader than § 301, the court held the plaintiffs' RICO claims were preempted because they depended upon the rights created in the CBA); Hubbard v. United Airlines, Inc., 927 F.2d 1094, 1097 (9th Cir.1991) (also erroneously stating that RLA preemption is broader than under § 301, but holding that plaintiff's RICO claim would nonetheless be preempted under the RLA "[e]ven if preemption under [ § 301] provided a proper analogy").
 
 
 16
 Finally, the plaintiffs mistakenly rely on Caterpillar Inc. v. Williams, 482 U.S. 386, 398-99, 107 S.Ct. 2425, 2432-33, 96 L.Ed.2d 318 (1987) (relying on the well-pleaded complaint doctrine, the Supreme Court held that state law claims not grounded on a labor contract did not arise under federal law),[8] and Belknap, Inc. v. Hale, 463 U.S. 491, 500, 103 S.Ct. 3172, 3177-78, 77 L.Ed.2d 798 (1983) (finding that non-union employees' breach of contract claims should not be preempted because federal law does not intend to deprive innocent third parties of their normal remedies),[9] to support their position that individual breach of contract claims, when independent of labor agreements, are not preempted by federal labor law.
 
 
 17
 More apposite is the reasoning of J.I. Case Co. v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), where the Supreme Court discussed the relationship between unions' bargaining responsibilities and union members' individual contracts:
 
 
 18
 Individual contracts, no matter what the circumstances that justify their execution or what their terms, may not be availed of to defeat or delay the procedures prescribed by the [federal labor laws] looking to collective bargaining ...; nor may they be used to forestall bargaining or to limit or condition the terms of the collective agreement....
 
 
 19
 ... The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group....
 
 
 20
 ... [A]dvantages to individuals may prove as disruptive of industrial peace as disadvantages. They are a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long-range expense of the group as a whole.
 
 
 21
 Id., 321 U.S. at 337-39, 64 S.Ct. at 580-81; see also Vacca v. Viacom Broadcasting of Missouri, Inc., 875 F.2d 1337, 1342-43 (8th Cir.1989) (holding plaintiff's individual contract, negotiated separately from the CBA, to be preempted by § 301). Particularly in the instant case, the plaintiffs concede that United actively attempted to protect them from harassment for about two years, yet the harassment continued. Both United and ALPA now argue these agreements were made, in part, to ease labor tension between the strikebreakers and strikers and thereby reduce the harassment. Ultimately, we are again drawn to the inevitable conclusion that whether or not United breached its contract to protect the plaintiffs is inextricably intertwined with the CBAs.
 
 
 22
 The same analysis governs the plaintiffs' claim against ALPA for tortious interference with contract. To sustain this claim under Colorado law, the plaintiffs must prove (a) that a contract existed between them and United, (b) that ALPA knew of the contract, (c) that ALPA intentionally induced or caused United not to perform its contract, and (d) the resulting damage. Henderson v. Times Mirror Co., 669 F.Supp. 356, 362 (D.Colo.1987), aff'd, 876 F.2d 108 (10th Cir.1989); Runyan v. United Bhd. of Carpenters, 566 F.Supp. 600, 607 (D.Colo.1983); Galleria Towers, Inc. v. Crump, Warren & Sommer, Inc., 831 P.2d 908, 912 (Colo.Ct.App.1991), cert. denied, Colo. June 1, 1992. Whether ALPA caused United to breach its contract to protect the plaintiffs cannot be determined without examining and comparing the promised protections afforded by United and the alleged withdrawal of those protections as decided in subsequent negotiating sessions.
 
 
 23
 II. The Farmer Exception.
 
 
 24
 The plaintiffs contend that, even if their claims would normally be subject to RLA preemption, their tort claims fall within the exception to the preemption doctrine established by the Supreme Court in Farmer v. United Bhd. of Carpenters & Joiners, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977) (holding that an otherwise preempted claim could be prosecuted in state or federal court if the conduct alleged was sufficiently outrageous). Farmer was decided under a separate federal statute and the circuits have split over whether the Farmer exception applies to claims of preemption under § 301 or the RLA.
 
 
 25
 In Johnson, we expressly held that "Allis-Chalmers and Lingle, not Farmer, control § 301 pre-emption and we decline to hold otherwise." Johnson, 921 F.2d at 1021. The district court, characterizing the instant case as one of first impression, properly employed the principles enunciated in Johnson and determined that the Farmer exception was inapplicable. The plaintiffs refer us to dicta in Albertson's, Inc. v. Carrigan, 982 F.2d 1478, 1482-83 (10th Cir.1993), implying that Johnson should be limited to its facts, and argue that the Farmer exception is applicable in the RLA preemption context. However, the holding in Albertson's, that the plaintiff's claims were not preempted by the RLA, was based on the fact that there was no need to interpret the CBA. Id. at 1482. Also, as we noted in Albertson's, we have consistently held that a cause of action for intentional infliction of emotional distress or outrageous conduct is preempted by § 301 and the same logic prevails under the RLA. Id. (citing Mock, 971 F.2d at 529; Johnson, 921 F.2d at 1020); Viestenz v. Fleming Cos., 681 F.2d 699, 702-04 (10th Cir.), cert. denied, 459 U.S. 972, 103 S.Ct. 303, 74 L.Ed.2d 284 (1982).
 
 
 26
 III. The Exclusive Remedy Provision of the Colorado Worker's Compensation Act.
 
 
 27
 The district court ruled that to the extent plaintiffs' emotional distress claims are based on United's alleged vicarious liability for harassment by the striking pilots under a respondeat superior theory, the claim is precluded by the exclusive remedy provisions of the Colorado Worker's Compensation Act ("WCA"). Under the WCA, injured claimants are "compensated if a sufficient nexus exists between the employment and the injury." Maryland Casualty Co. v. Messina, 874 P.2d 1058, 1063 (Colo.1994) (en banc). Whether the injury "arises out of" and is "in the course" of employment depends on an examination of the totality of the circumstances. Id.
 
 
 28
 On appeal, plaintiffs argue that Colorado law mandates that the exclusive remedy provision is inapplicable for injuries sustained by "specific targets." The cases they rely on, however, are inapposite. See, e.g., Velasquez v. Industrial Comm'n, 41 Colo.App. 201, 581 P.2d 748 (1978) (denying compensation based upon the fact that the assault originated from the private life of an employee and the shooting happened only coincidentally at the workplace); Ferris v. Bakery, Confectionery & Tobacco Union, Local 26, 867 P.2d 38 (Colo.Ct.App.1993) (finding a genuine factual controversy regarding the job relatedness of plaintiff's claims of sexual harassment), cert. denied, Colo. Jan. 31, 1994.
 
 
 29
 Better guidance is provided by Rendon v. United Airlines, 881 P.2d 482 (Colo.Ct.App.1994), where the Colorado Court of Appeals held the claims of harassment and assault by a plaintiff, who was specifically targeted because of his sexual orientation, were inherently connected to and arose out of his employment. In Rendon, the plaintiff was harassed for a characteristic wholly unrelated to work; nevertheless, the court held the "injuries have an inherent connection with the employment and are compensable even if the subject of the dispute is unrelated to the work and if the work merely brought the employees together and created the relations and conditions resulting in the dispute." Id. at 484-85 (citing In re Question Submitted by U.S. Court of Appeals, 759 P.2d 17, 23 n. 8 (Colo.1988)). Thus, when "the friction and strain created by [tense labor relations in] the work environment ... place[ ] claimant in a position to receive the impact of his coworker's personality and increase[ ] the likelihood of assault," the claim is compensable under the WCA. Id. at 485. In the instant case, the admitted reason for the harassment arose directly from employment: the plaintiffs were "specifically targeted" because they chose to work during a strike.
 
 
 30
 Finally, plaintiffs contend that Colorado does not recognize a "zone of danger" for those acts causing injury occurring at their homes or away from work. It is uncontroverted that the majority of the alleged incidents of harassment occurred while the plaintiffs were working. As for the remaining incidents, the Colorado Supreme Court has indeed recognized a "zone of special danger" as a variable that Colorado courts should consider in any WCA analysis. Messina, 874 P.2d at 1063 (citing e.g., City & County of Denver v. Lee, 168 Colo. 208, 450 P.2d 352, 355 (1969)); see also Tri-State Commodities, Inc. v. Stewart, 689 P.2d 712, 714 (Colo.Ct.App.1984) (holding claim compensable because it occurred within "zone of special danger" created by conditions of employment). Accordingly, to the extent applicable, plaintiffs' emotional distress claims against United, based on vicarious liability, are precluded by the exclusive provisions of the WCA.
 
 CROSS-APPEAL
 
 31
 The plaintiffs' remaining emotional distress claims against ALPA arise out of the undisputed facts that during and following the twenty-nine day strike of United by ALPA, the working pilots and their families were the targets of massive abuse--some unspeakably vile--which has continued over a period of many years. The purpose of this abuse was to punish the working pilots for crossing the picket line, drive them out of their jobs at United, and make such a severe example of them that in future strikes union members would not dare to cross the line. See, e.g., Appellants' App. Vol. VI at 1713-14, 1717, 1726, 1731.
 
 The magistrate judge stated:
 
 32
 Plaintiffs have presented evidence that they were subjected to, among other things, food and drink contamination, property loss and property damage, death threats and threats of physical harm, threats of sexual assault of spouses and family members, and harassing phone calls and knocks on the door during the night on flight layovers, among other acts of harassment and intimidation. Such conduct is sufficiently outrageous to meet the threshold judicial inquiry and permit the matter to proceed to a jury.
 
 
 33
 Id. Vol. VII at 2206.
 
 
 34
 On appeal, the plaintiffs list hundreds of incidents involving acts against the working pilots and their families, ranging from childish harassment to criminal conduct. ALPA does not argue that these incidents did not happen. Rather, ALPA argues, alternatively, either that the emotional distress claim is preempted by the RLA, because it necessitates resort to the collective bargaining agreements, or that it is entitled to summary judgment on the merits.
 
 
 35
 The district court ruled against ALPA on preemption, and denied summary judgment on the ground that the plaintiffs had submitted sufficient direct and circumstantial evidence to create a genuine issue of material fact. Thereafter, we granted ALPA's petition under 28 U.S.C. § 1292(b) to review legal issues underpinning the district court's denial of ALPA's motion for summary judgment on the plaintiffs' emotional distress claims. ALPA's petition identified the following legal issues:
 
 
 36
 1. Whether plaintiffs' claims against ALPA for intentional infliction of emotional distress, loss of consortium, and punitive damages, are preempted under the Railway Labor Act, 45 U.S.C. §§ 151-88.
 
 
 37
 2. Whether ALPA can be held vicariously liable for the alleged acts of its members on the basis of its exercise of federally protected free speech rights through generalized criticisms of strikebreakers and strikebreaking, or on the basis of its performance of federally mandated and protected collective bargaining responsibilities.
 
 
 38
 3. Whether ALPA can be held vicariously liable for the alleged acts of its members either on the theory that it had an affirmative duty to prevent those acts or on the theory that it is responsible for its members' "mass actions."
 
 
 39
 A. As to the first issue, we agree with the district court's conclusion that the RLA does not preempt the plaintiffs' emotional distress claims. Unlike RLA preemption of issues involving United and other claims against ALPA, it is unnecessary in this case to interpret the CBA or other agreements to find liability for outrageous conduct. While the BWA provides that ALPA will "neither ... engage in or condone any activities which might constitute reprisals or recriminations as a result of the ALPA strike," United Suppl. App. Vol. VI at 1618, the alleged conduct here does not need to be explained in terms of the contract. Obviously, outrageous conduct is "not even arguably sanctioned by the labor contract." Keehr v. Consolidated Freightways of Delaware, Inc., 825 F.2d 133, 138 n. 6 (7th Cir.1987) (finding outrageous conduct claim not preempted because evaluation of whether vulgar remarks about plaintiff's wife was outrageous would not involve consideration of the contract); cf. Johnson, 921 F.2d at 1020-22 (noting the varying results among circuits involving § 301 preemption for intentional infliction of emotional distress, but holding Johnson's claims were preempted because "[e]ach of Johnson's allegations directly relates to either explicit or implied rights derived from the CBA").
 
 
 40
 ALPA nevertheless argues that the claims are preempted because its labor agreements specifically call for disciplinary procedures and responsibilities. Thus, it contends the plaintiffs' claims are dependent on interpreting CBAs because the district court would need to compare the disciplinary procedures set forth in agreements against the discipline actually meted out. Our response to this argument is guided by the analysis of the Seventh Circuit:
 
 
 41
 The mere fact that [plaintiffs] might be able to grieve [ALPA's] conduct under procedures provided in the collective bargaining agreement is not sufficient in itself to conclude that [plaintiffs'] tort claims are preempted. The crucial issue under Allis-Chalmers is not whether a claim can be taken through the grievance process but whether the state law tort claim being asserted purports to give meaning to the terms of the labor contract.
 
 
 42
 Keehr, 825 F.2d at 137.
 
 
 43
 Finally, we reject ALPA's argument that RLA preemption of the plaintiffs' emotional distress claims against United requires a like result with respect to ALPA. ALPA's Br. at 32. By way of understatement, the objectives, motives, and resulting conduct by ALPA and United during the period in question were different, and the dissimilarities support a different analysis.
 
 
 44
 B. The other legal issues raised by ALPA--free speech, collective bargaining, duty to act, and liability for mass action by union members--all relate to what constitutes competent direct or circumstantial evidence linking ALPA to outrageous acts against the working pilots. In short, did the district court proceed on improper legal assumptions when it concluded that there was a genuine issue of material fact on the intentional infliction of emotional distress issue? It appears so.
 
 
 45
 Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, applies in federal court adjudications of state tort claims arising out of labor disputes. United Mine Workers v. Gibbs, 383 U.S. 715, 737, 86 S.Ct. 1130, 1144-45, 16 L.Ed.2d 218 (1966). That section requires plaintiffs to present "clear proof of [a union's] actual participation in, or actual authorization of, such [unlawful] acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. § 106.
 
 
 46
 Clear proof means proof which is clear, unequivocal, and convincing. Ramsey v. United Mine Workers, 401 U.S. 302, 311, 91 S.Ct. 658, 664, 28 L.Ed.2d 64 (1971); Gibbs, 383 U.S. at 737, 86 S.Ct. at 1144-45. Such proof, together with the statutory requirements of actual participation in, or actual authorization of unlawful acts, or of ratification of such acts after actual knowledge thereof, 29 U.S.C. § 106, establish a congressionally mandated restrictive test of union responsibility for unlawful acts. See Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 217 n. 6, 100 S.Ct. 410, 414 n. 6, 62 L.Ed.2d 394 (1979). A preponderance of the evidence is insufficient to survive a motion for summary judgment by the union under the clear proof standard. Gibbs, 383 U.S. at 737, 739, 86 S.Ct. at 1144-45, 1145-46; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ("The judge must view the evidence presented through the prism of the substantive evidentiary burden.").
 
 
 47
 The terms "participation," "authorization," and "ratification" are fact based, so rules in this area must be general, allowing a case-by-case determination based on the unique facts of each case. In general, however, we adopt principles stated by this court in a related, but not controlling, context. Consolidation Coal Co. v. United Mine Workers, Local 1261, 725 F.2d 1258, 1263 (10th Cir.1984). Under those principles, union liability under § 6 for tortious acts cannot be established by an inference drawn solely from the fact that union members are committing unlawful acts, even in groups and even over a substantial period of time ("mass action" theory). Nor can liability be established by an inference drawn solely from the fact that the union fails to take affirmative measures to stop such acts ("best efforts" theory). There must be something more. Thus, while "proof of authorization or ratification can be based on circumstantial evidence," James R. Snyder Co. v. Edward Rose & Sons, 546 F.2d 206, 209 (6th Cir.1976); Yellow Bus Lines, Inc. v. Local Union 639, 883 F.2d 132, 136 (D.C.Cir.1989), modified in part on other grounds, 913 F.2d 948 (D.C.Cir.1990) (en banc), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991), "[i]n order to satisfy § 6 there must be evidence showing some definite and substantial connection between the [union] and [the unlawful act(s) ]." Ritchie v. United Mine Workers, 410 F.2d 827, 835 (6th Cir.1969) (emphasis added); see also Local Lodge 1297, Int'l Ass'n of Machinists & Aerospace Workers v. Allen, 22 Ohio St.3d 228, 490 N.E.2d 865, 868 (Ohio 1986) (judgment in favor of union where no direct evidence linked union to unlawful act).
 
 
 48
 In Yellow Bus Lines, Inc., for example, the evidence clearly showed the union had actual knowledge that its local business director, the union's agent under federal law, committed unlawful acts while running a strike. The union's failure to take affirmative remedial action against its business director's improprieties, and its decision to allow him to continue running the strike as before, were held to constitute knowing tolerance. Yellow Bus Lines, Inc., 883 F.2d at 136-37; see also Gibbs, 383 U.S. at 737, 739, 86 S.Ct. at 1144-45, 1145-46 (clear proof standard of § 6 is satisfied by a showing "either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law").
 
 
 49
 Additionally, while a union obviously cannot solicit or counsel unlawful acts by its members, as a general rule it cannot be liable under § 6 solely because it publishes articles critical of those it labels "scabs." And, the union is entitled to express opinions promoting job positions, security, and other matters for union members it deems deserving. That is what unions do. Common sense tells us that these published expressions of opinion will fan the flames of division and hostility in cases like the one before us; but one truly embarks on a slippery slope to suggest that juries should examine union publications every time a plaintiff complains about union hyperbole. See, e.g., Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 282-87, 94 S.Ct. 2770, 2780-83, 41 L.Ed.2d 745 (1974); Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 64-65, 86 S.Ct. 657, 663-64, 15 L.Ed.2d 582 (1966). There may well be situations involving rhetoric where juries may properly decide that unions have crossed the line between divisiveness and incitement to unlawful action for purposes of proving a tort. Such a line would have to be very obvious, however, and it is not that obvious here.[10]
 
 
 50
 With these principles in mind, we turn to evidence produced by the plaintiffs, and relied upon by the district court, as the basis for denying ALPA's motion for summary judgment.
 
 
 51
 The district court found the following seven pieces of evidence constituted clear proof, sufficient to survive summary judgment, that ALPA authorized or ratified the unlawful acts of its members: (1) two baseball caps with an anti-strikebreaker message, Appellants' App. Vol. VI at 1695-1706; (2) the words "show no mercy" on an ALPA bulletin board containing a list of strikebreakers' names, id. at 1707-09; (3) then-MEC Chair Dubinsky's failure to deny an allegation that "Union Leadership continues to encourage [post-strike harassment] and refuses to take any steps to stop it," id. at 1707, 1709; (4) a steady flow of "scab-bashing" articles and letters in ALPA publications, see, e.g., id., at 1712, 1726, 1731; (5) scab lists circulated throughout United, see, e.g., id. at 1632-43, 1645-57; (6) the use of toy noisemakers ("clickers") to express disapproval and alert strikers when strikebreakers entered their vicinity; and (7) the possession by many strikers of a "dirty tricks" handbook, id. Vol. v. at 1582-1617; see id. Vol. VII at 2199.
 
 
 52
 The record does not show any clear, unequivocal link between any of these items and ALPA. The strikebreaker lists come closest, along with Mr. Dubinsky's ubiquitousness. But a full review of the record simply does not get us past a "more likely than not" level of evidence to go to a jury--and a preponderance is not enough. Perhaps this is exactly the "mischief" predicted in Anderson v. Liberty Lobby, 477 U.S. at 272-73, 106 S.Ct. at 2522-23 (Rehnquist, J. dissenting). However, in the Norris-LaGuardia Act, Congress made a policy decision to insulate unions from liability to a significant degree, and we are bound by the statute.
 
 
 53
 That does not mean that we are insensitive to what happened here. Taking this record as true, some ALPA members committed unbelievably disgusting acts, even to the point of possibly endangering the flying public. Such members do not just want things their way, they justify force and intimidation to get their way. In the process, they discredit themselves and ALPA, and jeopardize the principles of a civilized society.
 
 
 54
 In any event, while the magistrate judge and the district court correctly identified the clear proof standard, we conclude that they misapplied that standard and directly and implicitly employed the wrong legal analysis in passing on ALPA's motion for summary judgment. We further conclude that it would be a pointless exercise to remand the case for further consideration on the issue since the outcome is clear.
 
 CONCLUSION
 
 55
 The judgment of the district court is AFFIRMED in part and VACATED in part, and the case is REMANDED to the district court with instructions to grant ALPA's motion for summary judgment on the emotional distress claims.
 
 HOLMES, District Judge, dissenting in part:
 
 56
 The majority opinion affirms the district court's grant of summary judgment in favor of United and ALPA on several claims. I fully concur in those portions of the opinion. However, insofar as the majority opinion vacates the district court's denial of summary judgment on the claim against ALPA for intentional infliction of emotional distress, I respectfully dissent.
 
 
 57
 The majority correctly recognizes that Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, imposes a heightened evidentiary standard in determining whether a union may be held liable for illegal actions taken by its members in the course of a labor dispute. Although the heightened standard guides a district court's summary judgment analysis, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), it does not require a plaintiff to establish a "clear, unequivocal link" between the union and the alleged illegal activities at this stage in the proceedings.[11] Rather, the inquiry on summary judgment is whether the trier of fact, drawing all logical inferences from the direct and circumstantial evidence presented, could reasonably find that the evidence was "clear proof" of the union's actual authorization of, participation in, or ratification of the acts complained of. Anderson, 477 U.S. at 255-56, 106 S.Ct. at 2513-14.
 
 
 58
 Reviewing a district court's grant of summary judgment, the Third Circuit recognized the applicability of section 6 but then noted:
 
 
 59
 [T]he "clear proof" standard should be applied by the factfinder in drawing inferences and making findings. On a Rule 56 motion we may not draw inferences or make findings. Thus, even on issues of union authorization, participation in, or ratification of acts complained of, our role is to determine only whether such inferences are, under the evidence, logically permissible. ... If logical inferences of union authorization, participation in, or ratification of the acts complained of are permissible, it will be for the trier of fact to apply the "clear proof" standard of section 6.
 
 
 60
 Altemose Const. v. Building & Const. Trades Council, 751 F.2d 653, 656 (3d Cir.1985) (emphasis added).
 
 
 61
 In the instant case, in order to survive summary judgment, Plaintiffs need not prove that they will ultimately prevail. Rather, they need only establish the existence of evidence from which a jury, applying the proper evidentiary standard, could reasonably return a verdict in their favor.
 
 
 62
 There exist in this record facts upon which a jury, drawing logical inferences, could reasonably conclude that the evidence constitutes clear proof that the union authorized, participated in, or ratified the allegedly illegal acts of its members. These facts, in my judgment, are sufficient to preclude the entry of summary judgment. First, the words "show no mercy" were written on the ALPA bulletin board along with a list of strikebreakers' names. A jury could reasonably infer from this that ALPA itself was encouraging union members to "show no mercy" to those whose names appeared on the list. Further, a jury could reasonably conclude, based upon Mr. Dubinsky's failure to deny allegations of union encouragement of post-strike harassment, that the union was indeed encouraging such harassment. Finally, a jury could reasonably find by "clear proof" that the pattern of publishing "scab-bashing" articles in ALPA publications evidences ALPA's authorization or ratification of the "scab-bashing" that was in fact occurring. Although the authorities cited in the majority opinion make clear that libel law does not preclude "uninhibited, robust, and wide-open" debate in written materials disseminated in the course of a labor dispute, Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 62, 86 S.Ct. 657, 662-63, 15 L.Ed.2d 582 (1966), they do not purport to hold that the union itself cannot be linked to the statements contained in such materials or that such statements cannot be used as evidence of union participation. The fact that a statement can be made without liability for defamation does not prevent a jury from determining why it was made and what its effect was or could have been. Here, I believe that a jury could reasonably answer these questions in a way that, under the applicable evidentiary standard, implicates the union itself in the actions of the individual union members.
 
 
 63
 Moreover, the Report and Recommendation reflects that the Magistrate Judge both identified and properly applied the correct substantive evidentiary standard in this case. The Report and Recommendation, which was adopted and affirmed by the district court, states:
 
 
 64
 Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, applies in federal court adjudications of state tort claims arising out of labor disputes. United Mine Workers v. Gibbs, 383 U.S. 715, 737[, 86 S.Ct. 1130, 1144-45, 16 L.Ed.2d 218] (1966). It provides that no association will be liable for the unlawful acts of its members except upon "clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts." Although the Act does not define "clear proof," the Supreme Court has held that a plaintiff must come forward with "more than a bare preponderance of the evidence to prevail." Gibbs, 383 U.S. at 737[, 86 S.Ct. at 1144-45]. Such evidence can be circumstantial, if it is clear. James R. Snyder Co. v. Edward Rose & Sons, 546 F.2d 206, 209 (6th Cir.1976).
 
 
 65
 Report & Recommendation at 14. The Magistrate Judge concluded and the district court agreed that "[t]he direct and circumstantial evidence presented by the plaintiffs is sufficient under Section 6 to raise a genuine question of fact as to whether there is clear proof that the ALPA authorized or ratified the unlawful conduct of its members." Id. at 19.
 
 
 66
 Based on the foregoing, I agree with the analysis and conclusion of the court below and therefore would affirm the decision of the district court in its entirety.
 
 
 
 *
 The Honorable Sven Erik Holmes, United States District Court for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 Defendants ALPA and ALPA Master Executive Council for United Airlines ("MEC") are referred to collectively as "ALPA." MEC is the ALPA body that represents United pilots
 
 
 [2]
 Frank Olson replaced Ferris in June 1987. David Pringle, one of United's labor relations negotiators, testified that Ferris advised him that United was now "actively going to attempt to appease the Pilot Union." Appellants' App. Vol. VII at 2112. Subsequently, United began dismantling the working pilots' protections
 
 
 [3]
 The eleven claims are:
 (1-4) various violations of Racketeer Influenced and Corrupt Organizations Act ("RICO"), §§ 1961 to 1968, and the state version of RICO, the Colorado Organized Crime Control Act ("COCCA"), Colo.Rev.Stat. § 18-17-104(3) and (4).
 (5-11) state common law claims: (5) intentional infliction of emotional distress, (6) conspiracy to inflict emotional distress, (7) breach of contract, (8) false representation against United (voluntarily dismissed), (9) tortious interference with contract against ALPA, (10) derivative claim for punitive damages, and (11) derivative claim for loss of consortium (pled by the plaintiffs' wives).
 
 
 [4]
 Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989), elaborated upon the distinction between "major" and "minor" disputes. In short, major disputes seek to create contractual rights, while minor disputes seek to enforce them. Id. at 302, 109 S.Ct. at 2480
 
 
 [5]
 Norris involved an aircraft mechanic's claim that he had been discharged, in violation of Hawaii's Whistleblower Protection Act, for refusing to certify the safety of a plane he considered to be unsafe and for reporting his safety concerns to the Federal Aviation Administration. In deciding Norris, the Court relied heavily on its reasoning in Lingle, where a terminated employee similarly filed a suit for retaliatory discharge rather than pursue the grievance and arbitration process provided for in the CBA. The Supreme Court held that § 301 of the Labor Management Relations Act (" § 301") did not preempt a state claim of retaliatory discharge, reasoning that even though the employee had access to arbitration through the CBA, it did not preclude the employee from enforcing her minimum state substantive rights. Lingle, 486 U.S. at 411, 108 S.Ct. at 1884. Thus, because the state law remedy required its own objective standards for resolution (i.e. the employer's motives for firing her), the Court held that federal law did not preempt the employee's "independent" state claim because the claim could be resolved without reference to the CBA. Id. at 410, 413, 108 S.Ct. at 1883-84, 1885. Accordingly, the Court in Norris held the plaintiff's claims were not preempted because the RLA was never intended to deny a litigant the protections that other labor laws provided when the worker's cause of action existed independent of a CBA. Norris, --- U.S. at ----, 114 S.Ct. at 2249
 
 
 [6]
 Thus, although Norris essentially overruled some circuits' prior decisions holding that the RLA's preemptive sweep was broader than that of § 301, the Tenth Circuit's RLA analysis was implicitly affirmed. See Gay v. Carlson, 60 F.3d 83, 87 (2d Cir.1995) (finding that Norris called into question its "expansive view of pre-emption under the Railway Labor Act"); Taggart v. Trans World Airlines, Inc., 40 F.3d 269, 274 (8th Cir.1994) (finding that "Norris narrowed the scope of RLA pre-emption"); Westbrook v. Sky Chefs, Inc., 35 F.3d 316, 317 (7th Cir.1994) (finding Norris overruled its prior RLA preemption standard); Piper v. Alaska Airlines, Inc., No. 93-35575, 1994 WL 424292, at * 4 (9th Cir.1994) (finding Norris "implicitly overrules" its prior RLA preemption standard)
 
 
 [7]
 The argument also ignores the plaintiffs' reliance on these arrangements and agreements in trying to prove the requisite factors under RICO/COCCA. See, e.g, Appellants' App. Vol. III at 851 n. 7, 884-87, 958; id. Vol. VIII at 2469-70. Thus, for example, the plaintiffs argued the "A-team," consisting of ALPA, MEC, and United management "became the structure by which the 'association in fact' " drove working pilots from United by agreeing to: revoke the Code of Conduct, dismantle the incident reporting system, discontinue the Company Grievance Policy, reinstate previously discharged striking pilots, cease all strike-related disciplinary proceedings, discontinue surveillance, help to establish the ALPA Professional Standards Committees, and reconfigure the Flight Training Center. Id. Vol. III at 884-87
 
 
 [8]
 Caterpillar 's significance, for plaintiffs in general, is greater leeway in choosing their forums, not in avoiding preemption. However, regardless of the forum selected, Caterpillar does not change the general rule that if a CBA must be interpreted to resolve the claim, even if the CBA interpretation is initiated by the defense, the federal or state court must hold the claim preempted by § 301. See Hanks v. General Motors Corp., 859 F.2d 67, 70 (8th Cir.1988)
 
 
 [9]
 The plaintiffs in Belknap were not, and never had been, members of a union, but were merely replacement workers with independent contracts of employment. See Belknap, 463 U.S. at 496, 103 S.Ct. at 3175-76. Plaintiffs therefore fail in their asserted classification as "innocent third parties" under Belknap, because they were members of the union and therefore subject to ALPA's CBAs. See Bowe v. Northwest Airlines, Inc., 974 F.2d 101, 103 (8th Cir.1992) (regardless of subsequent union membership, former union represented employees are "employees" for adjustment board purposes if their dispute arose from their employment), cert. denied, 507 U.S. 992, 113 S.Ct. 1602, 123 L.Ed.2d 164 (1993); see also Appellants' App. Vol. II at 379, 496 (even throughout the post-strike era, ALPA has represented many of the working pilots, including plaintiff Palmer)
 
 
 [10]
 Indeed, the plaintiffs presented three examples, assumedly their best illustrations of union rhetoric inciting its members' illegal actions, that fall far short of making an actionable claim. Plaintiffs' examples are (1) a letter from Mel Hoagland, Chairman of Council 33, on July 2, 1985, distributed to "My Fellow Pilots," stating: We "must make it absolutely clear ... the choice of being a strikebreaker is not a viable, acceptable, or pleasant option! These former aviators engaged in despicable, evil, immoral conduct; we must never let them forget what they tried and failed to do." Appellants' Br. at 15 (quoting Appellants' App. Vol. VI at 1716-17) (emphasis added in Appellants' Brief); (2) an article in a union newsletter entitled, "What Next?," stating: "[T]he scabs are not leaving the property in the predicted hurry." Appellants' Reply Br. at 15 (quoting Appellants' App. Vol. VI at 1712) (emphasis added in Appellants' Reply Brief); and (3) a UAL-MEC publication, stating: "[T]he last three and half years [have] ... begun the process (still uncompleted) of returning flight operations management to the control of the United pilots ... [and] restructuring the training center to eliminate a safe haven for scabs." Id. at 15-16 (quoting Appellants' App. Vol. VI at 1721) (emphasis added in Appellants' Reply Brief)
 
 
 [11]
 In this respect, the majority opinion cites Ritchie v. United Mine Workers, 410 F.2d 827, 835 (6th Cir.1969), for the proposition that section 6 requires a showing of "some definite and substantial connection" between the union and the unlawful acts. Ritchie, however, consisted of a challenge to a jury verdict. Upon review of the entire transcript of evidence actually presented to the jury in that case, the Sixth Circuit concluded that the record failed to support the jury's verdict. The standard for evaluating a jury verdict differs from the standard used in determining whether a jury should be allowed to render a verdict at all. Thus, I believe that Ritchie is inapplicable in the summary judgment context