United States Court of Appeals,

Eleventh Circuit.

No. 96-2539.

Arnold D. PILKINGTON, Rick Q. Dacosta, John P. Hlavacek, William P. O'Brien, Brian N. Walker, Meryl Getline, Joseph Salomone, Michael S. Custer, Leonard H. Gieschen, Plaintiffs-Appellants,

v.

UNITED AIRLINES, Air Line Pilots Association, International, International and Air Line Pilots Association, Master Executive Council for United Airlines, Defendants-Appellees.

May 22, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No. 92-1032-CIV-T-17B), Elizabeth A. Kovachevich, Chief Judge.

Before COX, Circuit Judge, KRAVITCH, Senior Circuit Judge, and STAGG[*], Senior District Judge.

STAGG, Senior District Judge:

Plaintiffs/appellants are nine non-striking pilots for United Airlines ("United"). Plaintiffs brought suit against United Airlines and the Airline Pilots Association ("ALPA") and the ALPA Master Executive Council ("MEC")[1] based on post-strike harassment of the non-striking pilots. The district court granted summary judgment in favor of United and ALPA, ruling that plaintiffs' civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.,* claims were not filed within the requisite statute of limitations and that all of plaintiffs' state-law claims were preempted by the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et*

---

[*]Honorable Tom Stagg, Senior U.S. District Judge for the Western District of Louisiana, sitting by designation.

[1]Defendants ALPA and MEC are referred to collectively as "ALPA." The MEC is the ALPA body that represents United pilots.

*seq.*

The plaintiffs appeal the grant of summary judgment on all of their federal and state-law claims against United and ALPA. The plaintiffs' RICO claims were not filed within the four-year statute of limitations provided for civil RICO actions and the plaintiffs' state-law claims are preempted by the RLA.

We affirm.

*I. FACTS AND PROCEDURAL HISTORY*

Prior to 1985, the pilots of United operated under a collective bargaining agreement negotiated between United and ALPA. On May 17, 1985, ALPA declared a strike against United that lasted twenty-nine days. In anticipation of this strike, United recruited "fleet qualified" pilots, *i.e.,* pilots already experienced and qualified to operate the aircraft then in United's fleet. These pilots were hired as permanent employees to replace the striking pilots. United ultimately hired 539 replacement pilots, including eight of the nine plaintiffs in this case. Plaintiff, Joseph Salomone, was already a pilot for United when the strike began, and he continued to work for United during and after the strike. Each fleet qualified pilot received a letter confirming that the pilot was being hired as a permanent replacement for striking pilots and that the job offer would remain valid even if a settlement were reached between United and ALPA. The employment letters also represented that due to the fleet qualified pilots' commitment during the strike, the pilots would have the full support of management in any difficulties they encountered during their employment.

The strike was settled on June 15, 1985, at which time ALPA and United formed a new collective bargaining agreement (the "1985 Agreement") which governed the employment of all pilots employed by United, including the plaintiffs. As part of the settlement, ALPA and United executed a "Back-to-Work" agreement, setting forth the terms under which striking pilots would return to their jobs. This agreement contained a "no-reprisal" clause which provided in pertinent part:

> The Association and the Company agree that neither will engage in or condone any activities which might constitute reprisals or recriminations as a result of the ALPA strike.... ALPA agrees not to level fines or take action against non-striking pilots.

On April 3, 1987, United and ALPA executed a "Letter of Agreement," wherein United agreed to retain the replacement fleet qualified pilots on the condition that they be placed below the returning fleet qualified pilots on the United-ALPA seniority list. ALPA agreed not to challenge that placement. This agreement also contained "no-reprisal" clauses in which ALPA agreed to take "extensive active measures to eliminate the residual tension between those pilots who struck and those who worked during the strike." United further agreed "to take extensive measures to restore a positive working relationship with all pilots."

The plaintiffs allege that harassment commenced with the strike in May of 1985. Plaintiffs allege that they underwent continuous, illegal harassment from ALPA pilots for working during the strike and that the harassment continues to this date. The harassment alleged includes, *inter alia,* physical threats, vandalism, assault and battery, the theft and destruction of

personal property, ostracism by ALPA pilots at work and during flights, hate mail, verbal insults, and ridicule.

Plaintiffs contend that United and ALPA have breached the no-reprisal clauses of the aforementioned agreements by condoning the harassment against the fleet qualified pilots. They claim that United has failed to enforce the agreements against ALPA and that ALPA has condoned and actually encouraged the harassment. United initially attempted to protect the plaintiffs through various protective measures and by making strong statements against the harassment. It is alleged, however, that within a few years of the strike, United determined that, in an effort to further labor harmony, it was more beneficial for it to please ALPA than for it to protect the plaintiffs.

On March 23, 1994, the plaintiffs filed their first amended complaint, alleging five claims for relief based on the post-strike harassment.[2] United and ALPA filed separate motions for summary judgment. On March 27, 1996, the district court granted the summary judgment motions of both United and ALPA, dismissing the RICO claim and holding that all of the plaintiffs' state-law claims were preempted by the RLA.

Additionally, this court notes that the Tenth Circuit has already decided a case very similar in many respects to the case

---

[2]The five claims alleged in the first amended complaint are (1) violation of RICO; (2) tortious interference with a contract; (3) tortious interference with a business relationship; (4) breach of contract; and (5) fraudulent misrepresentation. Originally, the plaintiffs alleged a violation of the duty of fair representation under the RLA. This claim was dropped, and the RICO claim inserted, in the first amended complaint.

*sub judice.* In *Fry v. Airline Pilots Association International and United Airlines, Inc.,* 88 F.3d 831 (10th Cir.1996), the court addressed the issue of RLA preemption of many of the state-law claims that are raised in the current controversy before this court. The background and basic facts of *Fry* are virtually identical to those in the present case. Although the plaintiffs in *Fry* are different from the plaintiffs in this case, both sets of plaintiffs were part of the same group of fleet qualified pilots employed by United during the strike and allegedly harassed during and after the strike.

## II. STANDARD OF REVIEW

This court reviews the grant of summary judgment *de novo* and must determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgement as a matter of law. *Batey v. Stone,* 24 F.3d 1330, 1333 (11th Cir.1994).

## III. DISCUSSION

A. Plaintiffs' RICO Claims

1. The Proper Accrual Period Of Civil RICO Claims

Civil RICO actions are subject to a four-year statute of limitations. *Bivens Gardens Office Bldg., Inc. v. Barnett Bank*, 906 F.2d 1546, 1550 (11th Cir.1990), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), citing *Agency Holding Corp. v. Malley-Duff & Assoc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The Supreme Court in *Agency Holding,* however, expressly left open the question of when a civil RICO cause of action begins to accrue. *Bivens,* 906 F.2d at 1550. In *Bivens,* this court was called upon "to decide the appropriate accrual rule

to apply when the complaint alleges that, as the result of a conspiracy to violate RICO and substantive violations of RICO, the plaintiffs suffered several independent harms at the hands of the defendants over a period of eight years." *Id.* at 1550. Adopting the rule of "separate accrual," this court joined the Third Circuit in *Keystone Insurance Co. v. Houghton,* 863 F.2d 1125 (3d Cir.1988), in holding that when "a plaintiff [is] injured by one or more predicate acts, a civil RICO cause of action for damages will not accrue until the plaintiff knows, or should have known, of his injury and that the injury is part of a pattern of racketeering activity." *Id.* at 1554.

The plaintiffs in *Bivens* alleged three injuries: (1) the wrongful takeover of Bivens Center, Inc.; (2) the mismanagement and diversion of corporate assets; and (3) the wrongful sale of the Bivens Gardens Hotel for less than its fair market value. *Id.* at 1551. They alleged that these injuries were "continuing" and "independent" so as to extend the accrual period for each RICO claim. *Id.* at 1552. We held that the injuries were "separate and independent" from the injuries flowing from the wrongful takeover of the hotel. *Id.* at 1556. Thus, under the accrual rule announced by this court in *Bivens,* a new RICO claim would begin to accrue when the plaintiffs knew, or should have known, about a new and independent injury and that the new and independent injury was the result of a pattern of racketeering activity. *See id.*

In determining that these injuries were "separate and independent" injuries, the *Bivens* court cited with approval the language of the Second Circuit in *Bankers Trust Co. v. Rhoades,* 859

F.2d 1096, 1103 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989), that "new and independent" injuries would begin a new accrual period for the plaintiff's RICO claims. *Id.* at 1552. Applying the rules set forth in *Bivens* to the present case, we find that the district court was correct in dismissing plaintiffs' RICO claims due to the running of the statute of limitations.

For purposes of this analysis, the court will assume that plaintiffs' RICO claims, first pleaded in their amended complaint in March 23, 1994, were made retroactive to the date of their original petition, July 24, 1992. The district court found that the plaintiffs knew, or should have known, of their injury and that it resulted from a pattern of racketeering activity by 1987, at the latest. In 1986, plaintiff Arnold D. Pilkington and other pilots formed an association known as the Fleet Qualified Pilots Association ("FQPA"). Apparently, this organization was formed to address and combat the continuing harassment that non-striking United pilots faced from ALPA members. In July of 1987, Pilkington and another pilot mailed letters to the fleet qualified pilots asking for support of the FQPA. According to the district court, these letters indicated that by July of 1987, the pilots (1) believed that their mental distress and intolerable work situation were caused by the alleged pattern of harassment by striking pilots that had begun two years before; (2) believed ALPA and United were responsible for the harassment; and (3) had consulted counsel with respect to injuries suffered as a result of the harassment. These letters, contained in the record, clearly establish that by the

period of July 1987 to December 1987, the fleet qualified pilots, including the plaintiffs, had knowledge of their injuries and knew that the injuries were caused by a pattern of harassment that had begun as early as May of 1985. Thus, the plaintiffs' RICO claims must have been filed by December 1991, at the latest, to avoid the terminal effect of the statute of limitations. Plaintiffs, who filed their RICO claims on July 24, 1992, did not file their RICO claims timely.

Other facts in the record indicate that plaintiffs had knowledge of their injuries and that the injuries resulted from the pattern of harassment more than four years prior to July 1992. In the original and amended complaints, plaintiffs allege that the harassment began and became pervasive by the time the strike was ending in late June of 1985. The allegations in the complaint make it clear that the plaintiffs knew soon thereafter that the harassment would continue, that it was part of a pattern, that it was affecting their job performance, and that it was causing mental and emotional suffering. The plaintiffs allege that this ongoing pattern of harassment began in 1985. Thus, soon thereafter the plaintiffs either knew, or should have known, that they were suffering injuries and that the injuries were the result of a pattern of harassment. Thus, at the latest, the plaintiffs should have known of their injuries by July of 1987. At the earliest, plaintiff's should have known of their injuries as July of 1986, one year after the continuous harassment began. Plaintiffs did not file suit until six years after July 1986 and five years after July

of 1987.[3]

Plaintiffs contend, however, that they did not know, or could not have known, that they had been injured in their business or property until 1990 when plaintiff Leonard Gieschen ("Gieschen") elected to take an unpaid personal leave of absence from which he never returned. It is alleged that Gieschen left his employment with United due to the toll that the harassment had taken on his job performance as well as his mental and emotional well being. The damages alleged by Gieschen, however, are not mentioned in either complaint filed by the plaintiffs. This issue is raised before this court in the briefs filed by the plaintiffs and the supplemental brief filed by Gieschen. In his brief, Gieschen alleges that severe depression and mental and emotional problems caused his leave of absence from United in 1990.

To the extent that Gieschen, or any other plaintiff, seeks to recover under RICO for personal injury, or pecuniary losses resulting from personal injury, this claim is not cognizable under RICO. *See Grogan v. Platt,* 835 F.2d 844 (11th Cir.), *cert. denied,* 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988) (Kravitch, J.). In *Grogan* we stated: "[i]n our view, the ordinary meaning of the phrase "injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom." *Id.* at 847. Thus, to the extent that the plaintiffs claim that the emotional

---

[3]Of interest to the court is the fact that on October 13, 1989, seven of the nine plaintiffs in this action filed suit in the Northern District of Illinois (*Pilkington v. Air Line Pilots Assoc., International,* No. 89 C 7754 (N.D.Ill.1989)) against ALPA and United alleging, *inter alia,* that they had undergone a four year campaign of harassment. The suit was voluntarily dismissed by the plaintiffs soon after its filing.

and mental distress suffered by the harassment caused them an "injur[y] in [their] business or property," this claim is unavailing. The plaintiffs' reliance on this type of injury to avoid the statute of limitations is also misplaced. An injury not cognizable under RICO will not suffice as an injury sufficient to begin the act's accrual period.

Moreover, Gieschen knew, or should have known, of his injury—injury cognizable under RICO, such as injury in his business or property, other than personal injury—many years prior to 1990. The first amended complaint alleges that Gieschen was first harassed on August 20, 1985. He was then harassed in July of 1986, and again in August of 1987. Essentially, Gieschen was undergoing the same pattern of harassment alleged by all plaintiffs that began soon after the strike ended in 1985. Therefore, Gieschen knew or should have known of his injury and that the injury was the result of a pattern of racketeering activity as early as July 1986 or as late as August 1987. Suit was filed in July of 1992, more than four years after either of these dates.

2. Separate Accrual Rule

Plaintiffs claim that under the separate accrual rule adopted in *Bivens,* each time the plaintiffs suffered injury from the harassment a new RICO cause of action accrued. The harassment suffered by the plaintiffs allegedly continued well after this suit was filed in 1992. Thus, plaintiffs contend that new RICO causes of action were accruing even after this suit was filed. Plaintiffs argue that each act of harassment accounts for a new and independent injury as contemplated by *Bivens.*

In *Bivens,* we analyzed the Second Circuit's use of the terms "new and independent" in *Bankers Trust.* We held that the mismanagement and wrongful diversion of corporate assets between 1975 and 1981, and the wrongful sale of the partnership's major asset, the Bivens Gardens Hotel, in 1981, were "new and independent" injuries because they were not injuries that naturally flowed from the wrongful takeover of the corporation, Bivens Center, Inc., in 1975. *See Bivens,* 906 F.2d at 1551. The "new and independent" injuries involved independent breaches of duties owed by the defendants as corporate directors and officers. *Id.*

Likewise, other Circuits have used the "new and independent" language when analyzing their separate accrual rules. These Circuits help shed light on how this term is interpreted. The Ninth Circuit has provided three rulings for guidance. In *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68 (9th Cir.), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979), the plaintiff accused car manufacturers of violating the Clayton Act because they all agreed not to purchase the plaintiff's engine emission control devices. By 1964, all manufacturers had refused to buy the plaintiff's device. The plaintiff claimed it suffered a new injury because another company refused to use its device in 1965. The court held that the plaintiff had been injured in 1964 when the car manufacturers' "irrevocable, immutable, permanent, and final" decision was made. *Id.* at 72. A subsequent refusal did not create a new injury. *Id.*

In *Pace Industries, Inc. v. Three Phoenix Co.,* 813 F.2d 234 (9th Cir.1987), the court held that "two elements characterize an

overt act which will restart the statute of limitations: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) It must inflict *new and accumulating injury* on the plaintiff." *Id.* at 238 (emphasis added).

In *Grimmett v. Brown,* 75 F.3d 506 (9th Cir.1996), the former wife and trustee of her ex-husband's bankruptcy estate, Joanne Siragusa, brought suit under RICO to recover from an attorney, Patricia Brown. Brown allegedly masterminded a fraudulent scheme to conceal the ex-husband's interest in his medical practice for purposes of defeating the former wife's community property interest in the practice. The court found that Siragusa's primary injury was the loss of her interest in her ex-husband's medical practice. Such injury was perfected upon the filing of the bankruptcy petition by her ex-husband. *See id.* at 513-14. Siragusa alleged four post-filing injuries that she argued were new: (1) mail fraud by submitting false documents to the Bankruptcy Court; (2) obstruction of justice by concealing documents and testifying falsely in the proceeding; (3) defrauding a doctor of the practice; and (4) defrauding the practice's junior owners by not disclosing the practice's full liability to Siragusa. *Id.* at 514. The court found none of these injuries to be new and independent. *See id.* The injuries were all part of the same bankruptcy scheme and all lead to the loss of Siragusa's interest in the practice; neither the acts nor the injuries were new. *See id.*

In *Bingham v. Zolt,* 66 F.3d 553, 560 (2d Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1418, 134 L.Ed.2d 543 (1996), the

court held that additional financial losses that resulted from a company's decision to use defective equipment were not independent of the original actionable injury of receiving defective generators in derogation of its contract and warranty rights. A mere recharacterization or continuation of damages into a later period will not serve to extend the statute of limitations for a RICO action. *Glessner v. Kenny,* 952 F.2d 702, 708 (3d Cir.1991). Likewise, the Eighth and the Tenth Circuits use the "new and independent" language in their analysis of the separate accrual rule. *See Association of Commonwealth Claimants v. Moylan,* 71 F.3d 1398 (8th Cir.1995); *Bath v. Bushkin,* 913 F.2d 817 (10th Cir.1990).

In the case *sub judice,* the district court ruled that the injuries suffered by the plaintiffs were not new and independent injuries, but rather, a single, continuous course of injury—specifically, ongoing emotional and physical distress designed to force the plaintiffs to either leave their employment or to lower job performance. We agree. The injury suffered by the plaintiffs has been a continuation of the initial injury that resulted from the harassment. With each act of harassment the adverse impact on the plaintiffs' job performance may accumulate, however, the injury is not *new and independent.* The injury allegedly suffered by the plaintiffs after July of 1988 was not unfamiliar, strange, or different. It was the same injury that has been accumulating since 1986. Stated another way, the injuries allegedly suffered after suit was filed in 1992 are merely recharacterizations and continuations of the same injuries

previously alleged to have been suffered since 1986. *See Glessner,* 952 F.2d at 708.

3. Last Predicate Act Rule

Plaintiffs also contend that the statute of limitations has not run because under the "last predicate act" rule as applied in *Keystone,* they are entitled to recover for damages incurred after 1992, as long as the last predicate act committed by the defendants occurred within four years of the time the plaintiffs filed suit. In *Bivens,* we expressly rejected the application of the last predicate act rule under these circumstances. As we explained in *Bivens,* in *Keystone,* the plaintiff relied in part on predicate acts that caused harm to *others* in order to establish the pattern of racketeering activity. In *Bivens,* and in the present case, the plaintiffs allege acts that caused harm to them. We find it appropriate to analyze when the plaintiffs knew or should have known that *their injuries* were the result of a pattern of racketeering when determining the date their civil RICO cause of action accrued. *See Bivens,* 906 F.2d at 1554. Thus, the last predicate act rule provides the plaintiffs no relief from the statute of limitations in this case.

B. Railway Labor Act Preemption

The district court held that all of the plaintiffs' state-law claims were preempted by the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.,* because resolution of the claims necessarily relied upon interpretation of the collective bargaining agreements ("CBAs") between United and ALPA. We agree.

Most of the provisions of the RLA apply to labor relations in

the airline industry. *Pyles v. United Air Lines, Inc.,* 79 F.3d 1046, 1049 (11th Cir.1996). The RLA has established a framework for the resolution of disputes between air carriers and their employees that "grow[ ] out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." *Id.,* citing 45 U.S.C. § 184. The distinguishing feature of such a dispute, termed a "minor dispute," is that "the dispute may be conclusively resolved by interpreting the existing [collective bargaining] agreement." *Id.* (citations omitted). Congress intended that these "minor disputes" be resolved through the grievance procedures of the RLA rather than in federal court. *Id.* at 1050. "Therefore, it has long been the rule that when the resolution of a state-law claim ... requires an interpretation of the CBA, the claim is preempted and must be submitted to arbitration before a system board of adjustment." *Id.*

The Supreme Court has adopted the preemption standard applied in cases under the Labor Management Relations Act ("LMRA"). *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 263, 114 S.Ct. 2239, 2249, 129 L.Ed.2d 203 (1994); *see Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). The LMRA standard narrows the otherwise broad preemptive scope of the RLA by precluding preemption of state-law claims that enforce rights independent of the CBA. *Pyles,* 79 F.3d at 1050, citing *Hawaiian Airlines,* 512 U.S. at 256-62, 114 S.Ct. at 2246-48. The fact that reference to a CBA may be required, particularly where factual issues are involved, is insufficient of itself to preempt an independent state-law claim; only where interpretation

of a CBA is required will the claim be preempted. *Pyles,* 79 F.3d at 1050 (citations omitted).

In *Pyles,* we found that the breach of contract claim—involving the breach of a letter of agreement similar to the one entered into here between United and ALPA—between United and ALPA in that case was preempted by the RLA. *See id.* at 1050. We found that the letter agreement was "by its terms, a modification of the CBA between United and its employees." *Id.* Thus, to interpret the letter was to interpret a portion of the CBA. *See id.* Because the CBA was "the only potential source of any rights [the plaintiff] may have to employment with United, one must interpret the CBA to determine what those rights are." *Id.*

Likewise, in *Lingle v. Norge Div. of Magic Chef,* 486 U.S. 399, 407, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988), the Court stated "if the resolution of a state-law claim depends upon the meaning of a collective bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute." In *Farmer v. United Brotherhood of C. & J. of America, Local 25,* 430 U.S. 290, 300, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338 (1977), the Court established a balancing test, requiring the courts to make "a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation." In *Farmer,* the Court held that federal labor law did not preempt a union member's suit against the union

for intentional infliction of emotional distress.  Such a claim, however, is not present in the case *sub judice.*

## 1. Claims Against United

Plaintiffs' claims against United are for breach of contract and fraudulent misrepresentation.  Plaintiffs allege that by way of the letters of employment sent to them from United, United promised to protect the plaintiffs from the harassment they received after the strike in 1985.  Additionally, plaintiffs attach to their original complaint the "Back-to-Work" agreement and "Letter of Agreement" between United and ALPA as evidence of United's promise to protect its employees.

In plaintiffs' original complaint at paragraph 50, they allege that the ALPA owes the plaintiffs, who are all part of the bargaining unit at United, a duty of fair representation.[4]  Thus, the plaintiffs, in effect, allege that they are, or were, members of ALPA.  Further evidence of the plaintiffs' union membership includes the fact that the plaintiffs are all United pilots and that ALPA is the bargaining unit for all pilots employed by United. Resolution of whether United breached a promise made to plaintiffs and the ALPA to protect the plaintiffs from harassment necessarily depends on the interpretation of the CBAs for the following reasons.

United's duty to confront the post-strike harassment on the plaintiffs' behalf comes from the language of both the

---

[4]In the plaintiffs' original complaint, they stated a claim for violation of a duty of fair representation under the RLA. Subsequently, plaintiffs dropped this claim in their amended complaint filed on March 23, 1994.

"Back-to-Work" agreement and "Letter of Agreement" which are both part of the CBA. The "Back-to-Work" agreement was collectively bargained between ALPA and United. The agreement also states that it is subject to the 1985 collective bargaining agreement already in place at the time the "Back-to-Work" agreement was completed. The "Letter of Agreement" was also collectively bargained and in its first paragraph makes reference to the fact that it is entered into in accordance with the provisions of the RLA. *See Pyles,* 79 F.3d at 1050 (where the identical language contained in a letter of agreement was one of the factors used by the court in determining that a claim for breach of contract was preempted by the RLA). Thus, these agreements are part of the CBA, and any claims against United for breaches of the duties or representations contained therein necessarily require interpretation of the CBAs and are, therefore, preempted by the RLA.

Moreover, the ability of United to confront and discipline the harassment by ALPA members, or install preventative measures against the harassment, depends on the authority granted to United through the CBAs. United's ability to affect the employment situation of ALPA members is governed exclusively through the CBAs. Thus, any alleged breach of contract or fraudulent misrepresentation claim made against United is preempted by the RLA on the basis that resolution of such claims requires the interpretation of the CBA of 1985, the "Back-to-Work" agreement and the "Letter of Agreement" entered into by United and ALPA on behalf of United employees.

2. Claims Against ALPA

Plaintiffs' claims against ALPA include tortious interference with a contract and tortious interference with a business relationship. To prevail on a claim of tortious interference with a business relationship under Florida law, a plaintiff must establish four elements: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *T. Harris Young & Assoc. v. Marquette Electronics,* 931 F.2d 816, 825-26 (11th Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991). Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. *Smith v. Ocean State Bank,* 335 So.2d 641, 642 (Fla. 1st Dist.Ct.App.1976). The only material difference appears to be that in one there is a contract and in the other there is only a business relationship. *Id.*

The plaintiffs contend that ALPA's actions in collectively bargaining with United and United's interest in appeasing the union caused United to forsake the plaintiffs by violating the agreement alleged to have been entered into between the plaintiffs and United. The court also reads the amended complaint to include an allegation by the plaintiffs that the harassment caused interference with the relationship formed between the plaintiffs and United.

In its CBAs with United, ALPA agreed not to engage in, and in

fact to deter, the harassment that allegedly caused the breach of United's contract with plaintiffs and injured United's relationship with plaintiffs. The allegations made against ALPA are also very tightly intertwined with the alleged duty that United had to protect the plaintiffs. Indeed, assessment of ALPA's actions and the duty of United to protect against these actions can only be done by interpreting the CBAs. It may be found that some of the conduct engaged in by the ALPA is allowed under the CBAs. This will not be known, however, until the arbitration steps provided in the CBAs are undertaken.

Application of the *Farmer* factors also impels RLA preemption. First, we assess the federal interests involved in this case. The present suit involves three parties, all of whom are governed in their employment relationships by the aforementioned CBAs. Additionally, this is a suit by union members against their union and their employer. Thus, the federal concerns regarding the stability of labor relations and the uniformity of handling labor disputes are strong. On the other hand, the state does have an interest in protecting its citizens against conduct that is found to be "outrageous." The Court in *Farmer* found that the claim of intentional infliction of emotional distress—encompassing a certain type of outrageous conduct—avoided federal preemption. The claim pursued in *Farmer,* however, is not the nature of the claims pursued in this case. Lastly, we must consider to what extent avoiding preemption will interfere with the federal regulatory scheme designed to control labor relations. The determinative fact is that the CBAs control the relationships and employment activities

of this employment triangle. All parties—either by their membership in the ALPA, their status as employees of United or as the employer—are controlled by the CBAs regarding the issues of labor relations. Entertaining state-law remedies in federal court under these circumstances would be to by-pass the CBAs agreed to by all parties to this litigation.

Persuasive on this issue, and supportive of this court's ruling, is *Fry v. Airline Pilots Assoc., International,* 88 F.3d 831 (10th Cir.1996). The suit brought by Fry and other plaintiffs, also fleet qualified pilots, was similar, if not identical in many ways, to the case before this court. In *Fry,* the plaintiffs' state-law claims against United were (1) intentional infliction of emotional distress; (2) conspiracy to inflict emotional distress; (3) *breach of contract;* and (4) *false representation* (this cause of action voluntarily dismissed). *Id.* at 834 n. 3 (emphasis added). The claim against the ALPA was *tortious interference with a contract. Id.* (emphasis added). At issue in *Fry* was whether the RLA preempted these state-law claims. The court noted that "plaintiffs often [attempt] to avoid federal jurisdiction under § 301 by framing their complaints in terms of such diverse state law theories as wrongful discharge, intentional infliction of emotional distress, conspiracy, and misrepresentation." *Id.* at 836 (citations omitted). The court held that "[a]fter careful review of the record, we conclude that the district court properly determined that plaintiffs' state law claims, based on the theory that United reneged on its responsibility to protect the plaintiffs, cannot be understood without reference to the various

CBAs." *Id.* at 836. The court further stated "[i]n this case ... the alleged outrageous conduct is inextricably bound up with agreements and promises made to protect, and then actions allegedly forsaking, the plaintiffs." *Id.* With respect to the claim for tortious interference with a contract against ALPA, the court determined "[w]hether ALPA caused United to breach its contract to protect the plaintiffs cannot be determined without examining and comparing the promised protections afforded by United and the alleged withdrawal of those protections as decided in subsequent negotiating sessions." *Id.* at 838-39. The court did not, however, find the plaintiffs' emotional distress claims preempted. *See id.* at 841.

The decision by the Tenth Circuit is not binding authority for this court. It is, however, persuasive authority that provides valuable insight. The background and basic facts of *Fry* are the same as in this case. *Fry* covers the same strike by ALPA against United, the same CBAs, the same post-strike harassment, and the same post-strike actions taken by United and ALPA. The two material differences between *Fry* and this case are that the plaintiffs in *Fry* were different pilots than in this case and some of the claims alleged in the *Fry* complaint were different than those alleged here. However, all of the state-law causes of action alleged in the case *sub judice* are covered in *Fry.* Indeed, the Tenth Circuit's ruling on RLA preemption under virtually the same set of facts as the present case is very instructive.

The plaintiffs argue that their claims should fall under the *Farmer* exception to the preemption doctrine. *Farmer* held that an

otherwise preempted claim could be prosecuted in state or federal court if the conduct alleged was sufficiently outrageous. In *Farmer,* the cause of action alleged was intentional infliction of emotional distress. No such claim is alleged in the present case. All of plaintiffs' claims in this case sound in contract or quasi-contract. Merely because the plaintiffs allege outrageous conduct as the means by which their contracts were breached does not bring this case under the *Farmer* exception. Additionally, as discussed above, application of the *Farmer* balancing test calls for RLA preemption in this case.

Lastly, plaintiffs contend that *Belknap, Inc. v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), applies in this case to avoid federal preemption. In *Belknap,* the Court held that non-union employees' breach of contract claims should not be preempted. *Id.* at 500, 103 S.Ct. at 3178. The Court reached this holding because it determined that innocent third parties, that is, employees of the employer but not members of the union and not implicated in any CBAs, should not be deprived of their normal state-law remedies. *See id.* "It is one thing to hold that the federal law intended to leave the employer and the union free to use their economic weapons against one another, but it is quite another to hold that either the employer or the union is free to injure innocent third parties without regard to the normal rules of law governing those relationships." *Id.* Thus, *Belknap* is applicable in a situation where a non-union employee does not have at his disposal the protections of the union and the CBAs, but rather has only his normal state-law remedies against the union or

his employer.

As mentioned above, the plaintiffs are or were ALPA members, as alleged in paragraph 50 of the original complaint. They are pilots for United, and ALPA is the sole bargaining unit for the United pilots. Additionally, we agree with the district court in its ruling that once the striking workers returned to work under the newly negotiated CBA, the rights and duties of all parties involved, including the plaintiffs as United employees, were governed by the newly formed CBAs. Therefore, *Belknap* is inapposite. Likewise, the Tenth Circuit in *Fry* reached the same holding regarding the applicability of *Belknap*. *See Fry,* 88 F.3d at 838 & n. 9.

## *IV. CONCLUSION*

The plaintiffs' civil RICO action was properly dismissed by the district court because the statute of limitations had run. The district court properly found that all of the plaintiffs' state-law claims were preempted by the RLA because all of these claims necessarily require interpretation of the CBAs between United and ALPA. Therefore, we affirm the district court's granting of summary judgment in favor of United and ALPA.

AFFIRMED.