A01A1618. SOUTHERN INTERMODAL LOGISTICS, INC. v. D. J. POWERS COMPANY, INC.
(555 SE2d 478)

MIKELL, Judge.

Southern Intermodal Logistics, Inc. ("Southern"), an interstate motor carrier which ceased operations in 1994, filed this action under the Georgia Racketeer Influenced & Corrupt Organizations ("RICO") Act, OCGA § 16-14-1 et seq., against D. J. Powers Company, Inc. ("Powers"), a customs house broker. Southern alleged that Powers attempted to extort illegal "commissions" from Southern for hauling K-Mart's imported container freight from Savannah to various inland distribution facilities. When Southern refused to pay, Powers allegedly embarked on a scheme to coerce K-Mart to replace Southern, and it ultimately lost the account. The trial court granted summary judgment to Powers, ruling that the five-year statute of limitation for civil RICO claims, OCGA § 16-14-8, had expired. For the reasons that follow, we reverse.

This is a renewal action. A complete and detailed recitation of the underlying facts may be found in an order issued by the federal district court in the predecessor litigation. *Southern Intermodal Logistics v. D. J. Powers Co.*, 10 FSupp.2d 1337 (S.D. Ga. 1998). Construed most favorably to the nonmovant, the evidence reveals the fol-

---

lowing. At all times relevant to this action, K-Mart imported merchandise from the Far East in containers shipped by the Yang Ming Line, a foreign steamship company. Yang Ming's general agent in the United States was Solar International Shipping Agency, Inc. ("Solar"). In Savannah, Yang Ming was represented by Carolina Shipping Company ("Carolina").

In 1986 or 1987, Southern became a "house carrier" for Yang Ming, an arrangement whereby Southern billed Yang Ming the lowest market rate in exchange for the right to handle the overland shipment of the majority of Yang Ming's container freight. Until 1991, Southern handled 85 percent of Yang Ming's K-Mart cargo. Southern signed its first contract with Powers in 1988. The parties agreed that Powers would assign cargoes to Southern in exchange for a commission. It is undisputed, however, that Southern had already procured Yang Ming's business, without any effort from Powers.

Problems began in 1990, when Powers created a Domestic Transportation Department ("DTD") to increase revenues generated from brokering motor carrier freight. Marsha Herb was hired as DTD's director, and she drafted new contracts requiring the payment of "administrative fees" to Powers. Peter Hogan, Southern's president, deposed that these fees amounted to a five percent unearned commission. In March or April 1991, Herb demanded that Southern either pay Powers the commission on the Yang Ming/K-Mart freight or relinquish K-Mart's business to a different carrier. Hogan refused, claiming the commission was illegal. Herb then threatened to disparage Southern in order to influence K-Mart to pressure Yang Ming to cease doing business with Southern.

Hogan contacted Lloyd Seow, a Solar employee in New York, and Mike Collins, a Carolina employee in Savannah, to alert them to Herb's threats. According to Hogan, Seow and Collins indicated that Herb had been pressuring them to fire Southern. At first, Seow and Collins told Hogan not to worry. Eventually, however, Collins told Hogan that Southern should pay the commission because "[Herb is] going to cause all kinds of trouble. And she's got power with K-Mart and we've got to work this out." Moreover, Seow told Hogan that Herb had threatened to divert the K-Mart account from Yang Ming to another steamship line unless Carolina agreed to use a trucker selected by Powers.

Carolina finally succumbed to the pressure. On May 15, 1991, Collins met with Herb and other Powers representatives to coordinate their logistics so that Powers's truckers could begin hauling K-Mart containers. On May 20, Powers replaced Southern with a commission-paying carrier. Hogan testified that it was "some time" before he realized that he had lost the account, given the volume of Southern's business.

In July, Robert Frederick, transportation director for Senator Line, another steamship company that used Southern to transport containers for K-Mart, contacted Hogan and informed him that Herb was trying to persuade Frederick to stop using Southern. Presumably in response to this conversation, Hogan sent a letter on July 22, 1991, to Solar's vice-president, John Chou, warning him that Powers planned to fabricate complaints about Southern's quality of service in order to persuade Yang Ming to select a house carrier designated by Powers. Hogan deposed that he had not realized at that point that Southern had already lost the K-Mart account. In fact, Southern resumed hauling K-Mart containers for Yang Ming in August, although for reasons not made clear by the record.

Southern continued servicing K-Mart until shortly after December 17, 1991, when Yang Ming received a facsimile from two K-Mart employees, Shirley Pinkett and Linda Peterson, with instructions to discontinue using Southern because its service had "declined tremendously." However, according to Philip Abraham, director of cargo transportation for K-Mart at that time, there were no problems with Southern's service. Abraham also averred that Herb had telephoned him constantly since early April, criticizing Southern's performance and trying to convince him to use Powers's carrier. Herb called Southern a "no good carrier" and said that Hogan would "lie and cheat."

On July 22, 1996, Southern filed suit in superior court against Powers, Yang Ming, Solar, and Carolina, asserting that it lost the K-Mart freight as a result of Powers's racketeering activity. In addition, Southern claimed that Herb's false statements in communications to K-Mart employees constituted mail fraud and wire fraud under 18 USC §§ 1341 and 1343. Yang Ming removed the action to federal district court, and Powers, Yang Ming, and Solar moved for summary judgment. The district court denied Powers's motion, ruling that the statute of limitation had not expired. However, the court granted summary judgment to Yang Ming and Solar, destroying federal jurisdiction. The case was remanded to superior court. However, Southern voluntarily dismissed the action and refiled it in state court. Powers again moved for summary judgment on statute of limitation grounds. The trial court granted the motion, and Southern appealed.

1. OCGA § 16-14-8 provides: "Notwithstanding any other provision of law, a criminal or civil action or proceeding under this chapter may be commenced up until five years after the conduct in violation of a provision of this chapter terminates or the cause of action accrues." In *Blalock v. Anneewakee, Inc.*, 206 Ga. App. 676, 678 (426 SE2d 165) (1992), we held that the five-year statute of limitation commenced "when the civil RICO cause of action accrues, which we interpret[ed] to mean when the plaintiff discovers, or reasonably

should have discovered, that he has been injured and that his injury is part of a pattern."[1] Here, the trial court ruled that Herb's alleged extortionate threats made to Southern before July 22, 1991, were the injuries that commenced the running of the limitation period.[2] We disagree with this analysis.

The trial court relied in part on OCGA § 16-14-2 (b). Prior to its amendment in 1997, that Code section stated that the General Assembly intended the RICO Act to apply to "an interrelated pattern of criminal activity, the motive or effect of which is to derive pecuniary gain."[3] In 1997, the legislature added the phrase "or economic or physical threat or injury." In *State of Ga. v. Shearson Lehman Bros., Inc.*, 188 Ga. App. 120, 121 (2) (372 SE2d 276) (1988), we held that the pre-1997 expression of legislative purpose was not an element of a civil RICO cause of action. Similarly, we do not believe that the legislature intended it as a benchmark for starting the limitation clock.

The trial court additionally relied on *Hoffman v. Ins. Co. of North America*, 241 Ga. 328 (245 SE2d 287) (1978). *Hoffman*, however, is inapposite, as our Supreme Court simply concluded in that case that an action against an insurance agent for failure to procure a policy was not barred by the applicable statute of limitation.

There is no Georgia authority specifically addressing what constitutes a RICO "injury" under factually analogous circumstances for the purpose of starting the limitation period. Georgia law merely provides in pertinent part that "[a]ny person who is injured by reason of any violation of Code Section 16-14-4 shall have a cause of action. . . ." OCGA § 16-14-6 (c). Federal law is more restrictive. 18 USC § 1964 (c) limits a civil RICO cause of action to "[a]ny person injured in his business or property by reason of" the commission of a pattern of racketeering activity, as set out in 18 USC § 1962. (Emphasis supplied.)

"[U]ntil a person suffers an injury due to a RICO violation, he has no right to sue for damages, and thus a civil RICO cause of action cannot accrue until the person suffers injury." *Bivens Gardens Office Bldg. v. Barnett Bank*, 906 F2d 1546, 1552 (11th Cir. 1990). The Supreme Court of Georgia stated this principle succinctly in fixing

---

[1] In *Blalock*, we adopted the Eleventh Circuit's "injury and pattern" discovery rule, under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity. *Bivens Gardens Office Bldg. v. Barnett Bank*, 906 F2d 1546, 1554-1555 (11th Cir. 1990). In *Rotella v. Wood*, 528 U. S. 549, 553 (120 SC 1075, 145 LE2d 1047) (2000), the United States Supreme Court rejected the "pattern discovery" element of this rule, thereby overruling *Blalock*, but that does not affect our inquiry. *Rotella* interpreted the federal RICO statute, and, in any event, our inquiry in this case focuses solely on the injury element of the accrual rule.

[2] The district court declined to address this issue. *Southern Intermodal Logistics*, 10 FSupp.2d at 1357, n. 41.

[3] See *Waldschmidt v. Crosa*, 177 Ga. App. 707, 711 (2) (340 SE2d 664) (1986).

the point of accrual for an action based on economic losses resulting from alleged tortious negligent misrepresentation: "Indeed, until it suffered economic loss, [plaintiff] did not even have a claim for negligent misrepresentation, and we think it palpably obvious that in order for the prescriptive period to commence, the plaintiff must be able to state a cause of action." (Emphasis omitted.) *Hardaway Co. v. Parsons, Brinckerhoff, Quade &c.*, 267 Ga. 424, 427 (1) (479 SE2d 727) (1997).

In *Moeller v. Zaccaria*, 831 FSupp. 1046 (S.D. N.Y. 1993), an action alleging injuries stemming from a builder's alleged conspiracy to defraud homeowners, the court noted that the parties "misapprehend[ed] the key inquiry in determining when their RICO claim accrued by focusing on their discovery of the details of the alleged fraud scheme." Id. at 1050. The court ruled that the starting point of the limitation period was when the plaintiffs discovered or should have discovered the injuries to their property arising from the fraud. Citing *Bankers Trust Co. v. Rhoades*, 859 F2d 1096, 1103 (2nd Cir. 1988), the court stated, "[C]ongress tied the right to sue for damages under § 1964 (c), not to the time of the defendant's RICO violation, but to the time when plaintiff suffers injury to 'his business or property' from the violation." In *Moeller*, the court ruled that the statute of limitation began to run when the homeowners made their last payment to the builder. Id. at 1051.

As the Seventh Circuit articulated: "[T]here is an important distinction between discovery of an injury and discovery of a cause of action. The pattern element of RICO gives rise to the cause of action, but is not the injury itself." (Citations and emphasis omitted.) *McCool v. Strata Oil Co.*, 972 F2d 1452, 1465 (III) (A) (7th Cir. 1992). Similarly, in the instant case, we hold that the trial court erred in determining that the injury was the alleged wrongful conduct, i.e., Powers's alleged attempted extortion. Rather, the injury which started the running of the five-year limitation period was the economic loss sustained by Southern as a result of Powers's alleged wrongful conduct.

Having decided that the injury is Southern's loss of the Yang Ming/K-Mart account,[4] we focus on whether the evidence demonstrates, as a matter of law, that Southern knew or should have discovered its injury before July 22, 1991.[5] If so, Southern's suit, filed on July 22, 1996, is time-barred. On appeal from the grant of a summary judgment, we construe the evidence and all reasonable infer-

---

[4] We do not decide whether Southern knew, or should have discovered, that its injury was part of a pattern of racketeering activity.

[5] The evidence is clear that Southern sustained economic loss when it was replaced by another carrier from May 20 through early August.

ences and conclusions that may be drawn from it most favorably to Southern, as the party opposing the motion. *Patterson v. Proctor*, 237 Ga. App. 244, 246 (1) (514 SE2d 37) (1999). In so doing, we hold that whether Southern discovered, or, in the exercise of reasonable diligence, should have discovered, the injury before July 22, 1991, is a question of fact which must be resolved by a jury.

Key employees of Southern testified that they were unaware of the interruption in business. Dexter Bland, Southern's chief financial officer, testified that due to the volume of K-Mart cargo Southern continued to haul for other steamship lines, and the method by which the cargo was tracked, Southern would not have noticed the absence of the Yang Ming/K-Mart cargo. Daniel Mitchell, who supervised the Savannah terminal, gave similar testimony, noting that Southern continued to handle other containers for Yang Ming during the time period in question.

Hogan maintained throughout his deposition that he was unaware of the initial loss of the account prior to July 22. Similarly, the July 22, 1991, letter Hogan sent to Chou, Solar's vice-president, reflects that Hogan was unaware on that date that Yang Ming had already replaced Southern as its carrier of K-Mart freight. Powers contends that Hogan's deposition testimony is necessarily inconsistent with his interrogatory responses in this regard. In the responses, Hogan indicated that he had spoken to Jerry McNair, a Carolina representative, on numerous occasions between May and July 1991; that McNair admitted Powers's scheme was illegal and unfair; that Yang Ming had agreed to go along with it; and that McNair regretted that Southern had lost the Yang Ming/K-Mart business. In his deposition, Hogan maintained that these conversations took place during November or December 1991.

Under *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 30 (2) (343 SE2d 680) (1986), if a party offers a reasonable explanation for the contradiction, the court will not construe the testimony against him. Neither Hogan nor Southern has offered any explanation under oath for the contradiction between Hogan's deposition and the corporation's answers to its interrogatories. On the other hand, the rule which was reaffirmed in *Prophecy Corp.* requires that the testimony of a party be construed against him when it is self-contradictory. In the case at bar, there is evidence which is not testimony — the letter of July 22, 1991, sent by Hogan to Chou (Solar). The letter is documentary evidence, and it long predates the interrogatory answers and Hogan's deposition. As the nonmovant, Southern is entitled to the possible inference from the letter that the corporation's agents did not know of the injury until after the letter was written. Moreover, self-contradictory testimony is construed only against a party who is a witness. Hogan is not a party. In *Prophecy Corp.*, the leading Georgia precedent on this subject, Charles Rossi-

gnol was one of the plaintiffs and arguably the alter ego of the corporate plaintiff, Charles Rossignol, Inc. Here, although Hogan is Southern's majority shareholder, the evidence does not demonstrate as a matter of law that Hogan's deposition testimony was in actuality the testimony of the party, Southern.

In summary, the record reveals four pieces of evidence favoring the nonmovant: the testimony of Bland, the testimony of Mitchell, the testimony of Hogan, and the letter of July 22, 1991. One important piece of evidence favors the movant: the sworn interrogatory answers of the party plaintiff, verified on February 19, 1997, by Hogan. The deposition of a corporation's president and majority shareholder might well be construed against the corporation when the deposition testimony contradicts the corporation's interrogatory answers verified by the same witness. But this record contains the additional testimony of Bland and Mitchell as well as nontestimonial, documentary evidence — the letter of July 22. On this record, a jury issue remains as to when Southern knew, or should have discovered, that it had been injured. Accordingly, the grant of summary judgment to Powers on statute of limitation grounds must be reversed.[6]

2. Disposing of the issue of the accrual of the RICO action as to Southern's initial injury does not end our inquiry, however.[7] Southern contends that it suffered a new injury subsequent to the facsimile sent on December 17, 1991; the final loss of the Yang Ming/K-Mart account. Southern further alleges that this injury was caused by Herb's alleged mail fraud and wire fraud. Southern urges us to adopt the "separate accrual" rule, pursuant to which, it contends, the five-year limitation period would start running anew from the date of the subsequent injury.[8]

Under the separate accrual rule, "when a new and independent injury is incurred from the same violation, the plaintiff is again 'injured in his business or property' and his right to sue for damages from that injury accrues at the time he discovered or should have discovered that injury." *Bankers Trust Co. v. Rhoades*, supra at 1103. In *Bankers Trust*, the Second Circuit reasoned that the "separate accrual" rule flows logically from 18 USC § 1964 (c):

[C]ongress tied the right to sue for damages under § 1964 (c), not to the time of the defendant's RICO violation, but to

---

[6] While we granted Powers's motion to file a supplemental brief, the arguments contained therein further convince us that disputed factual issues mandate the reversal of summary judgment.

[7] It is necessary to address this issue in the event the jury determines that Southern knew, or should have discovered, its initial injury.

[8] No Georgia appeals court has addressed this argument.

the time when plaintiff suffers injury to "his business or property" from the violation. Consequently, a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury.

Id.[9]

We find the Second Circuit's logic persuasive, and we are inclined to adopt the separate accrual rule. Accordingly, we must determine whether the rule affords Southern any relief in this case. Southern contends, in essence, that the mail fraud and wire fraud constituted a pattern of racketeering activity, separate from the attempted extortion, which caused a separate injury. Powers contends that the injury sustained by Southern as a result of Herb's alleged mail fraud and wire fraud was merely a continuation of Herb's alleged attempts to extort commissions from Southern. Powers cites *Pilkington v. United Airlines*, 112 F3d 1532 (11th Cir. 1997), in which the Eleventh Circuit clarified the separate accrual rule: "under the accrual rule announced by this court in *Bivens*, a new RICO claim would begin to accrue when the plaintiffs knew, or should have known, about a new and independent injury and that the new and independent injury was the result of a pattern of racketeering activity." Id. at 1535 (III) (A) (1).

In *Pilkington,* nonstriking airline pilots alleged that they suffered continuous, illegal harassment, including physical threats, vandalism, assault and battery, and the like, at the hands of union pilots who were on strike. The court held that the plaintiffs' later injuries were merely "a continuation of the initial injury that resulted from the harassment. With each act of harassment the adverse impact on the plaintiffs' job performance may accumulate, however, the injury is not new and independent." (Emphasis omitted.) Id. at 1537-1538 (III) (A) (2).

The instant case is distinguishable from *Pilkington*. Southern initially lost the Yang Ming/K-Mart account from May 20, 1991, through early August and then regained the business. Southern alleges that it would have retained the account but for a campaign of mail fraud and wire fraud engaged in by Powers, culminating in the facsimile and the ultimate loss of the account sometime in December.

We would thus be inclined to hold that this ultimate loss is a new and independent injury that restarts the limitation clock. However, we are persuaded otherwise by Powers's argument that its alleged

---

[9] The Eleventh Circuit adopted the "separate accrual" rule in *Bivens Gardens Office Bldg. v. Barnett Bank*, supra at 1552. See also *Pilkington v. United Airlines*, 112 F3d 1532 (11th Cir. 1997).

acts of mail fraud and wire fraud in the form of its communications to K-Mart cannot constitute predicate acts of racketeering, for the reason that Southern cannot show that it relied to its detriment on any misrepresentations contained in the communications.

> To recover under a private cause of action in RICO, a plaintiff must show that the injury suffered flowed directly from the predicate offense. More specifically, when the alleged predicate act is mail or wire fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme.

(Citations and punctuation omitted.) *Gentry v. Volkswagen of America*, 238 Ga. App. 785, 791 (4) (521 SE2d 13) (1999). Accord *Longino v. Bank of Ellijay*, 228 Ga. App. 37, 40-41 (2) (491 SE2d 81) (1997).[10]

Southern has not demonstrated that it relied to its detriment on any communication made by Powers; therefore, Southern may not rely upon Powers's alleged acts of mail fraud and wire fraud in support of its argument that the injury suffered after December 17, 1991, constitutes a new and independent injury for the purpose of restarting the limitation clock.[11]

*Judgment reversed. Blackburn, C. J., and Pope, P. J., concur.*

DECIDED OCTOBER 11, 2001 — 

*Ladson & Suthers, M. Brice Ladson*, for appellant.
*Oliver, Maner & Gray, Patricia T. Paul, Cook, Noell, Tolley, Bates & Michael, Edward D. Tolley, Greenberg & Traurig, Robert E. Spears, Jr., Michael J. King, Kim T. Stephens*, for appellee.

---

[10] *Interagency, Inc. v. Danco Financial Corp.*, 203 Ga. App. 418 (417 SE2d 46) (1992), on which Southern relies, is inapposite, as it does not involve mail fraud or wire fraud.

[11] In a reply brief, Southern asserts that the mail fraud and wire fraud are not the only predicate offenses which proximately caused the subsequent injury. However, this contradicts Southern's previous argument, and we will not consider it.